**COMMONWEALTH of Pennsylvania, Appellee,**

v.

**Thomas BROWN, Appellant.**

Superior Court of Pennsylvania.

Submitted Feb. 13, 2006.

Filed July 17, 2006.

926

Jeanette D. Dickerson, Norristown, for appellant.

Kevin J. McCloskey, Asst. Dist. Atty., Norristown, for Com., appellee.

BEFORE: KLEIN, KELLY and POPOVICH, JJ.

OPINION BY POPOVICH, J.:

¶ 1 Appellant Thomas Brown appeals the judgment of sentence for possession with intent to deliver a controlled substance (PWID) on grounds that: 1) the trial court erred in denying his motion to suppress; and 2) the evidence was insufficient to sustain his conviction.[1] We affirm.

■■■ ¶ 2 "Our standard of review in addressing a challenge to a trial court's denial of a suppression motion is limited to determining whether the factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct." *Commonwealth v. La-Monte,* 859 A.2d 495, 499 (Pa.Super.2004) (*quoting Commonwealth v. Bomar,* 573 Pa. 426, 826 A.2d 831 (2003), *cert. denied,* 540 U.S. 1115, 124 S.Ct. 1053, 157 L.Ed.2d 906 (2004)). Our scope of review is limited:

> We may consider only the evidence of the prosecution and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the record supports the findings of the suppression court, we are bound by those facts and may reverse only if the court erred in reaching its legal conclusions based upon the facts.

*Commonwealth v. Grundza,* 819 A.2d 66, 67 (Pa.Super.2003), *appeal denied,* 574 Pa. 764, 832 A.2d 435 (2003) (*quoting Commonwealth v. Reppert,* 814 A.2d 1196, 1200 (Pa.Super.2002) (*en banc* )).

■■■ ¶ 3 In his first issue, Appellant asserts that the police possessed neither reasonable suspicion to stop nor probable cause to arrest him, which tainted evidence (a package of cocaine) he allegedly discarded (and subsequently retrieved by police) in a foot chase after being told to "stop" by a patrolman out of uniform and in an unmarked vehicle. Appellant cites *Commonwealth v. Jefferson,* 853 A.2d 404 (Pa.Super.2004), and *In the Interest of D.M.,* 566 Pa. 445, 781 A.2d 1161 (2001) (hereinafter *"D.M. II"*), to buttress his argument that his flight was provoked by the absence of a uniformed officer directing him to "stop" in the late evening hours (10:00 p.m.), which rendered the evidence seized as a result thereof subject to suppression.

¶ 4 The United States Supreme Court issued a *per curiam* order vacating *In the Interest of D.M.,* 560 Pa. 166, 743 A.2d 422 (1999) (hereinafter *"D.M. I"*) and remanded for further consideration in light of *Illinois v. Wardlow,* 528 U.S. 119, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000), which adopted the position that sudden flight by a defendant in a high crime area created a reasonable suspicion justifying a *Terry* [2] stop. Consequently, *Wardlow* held that a pat-down of the defendant under such circumstances was neither violative of the Fourth Amendment nor did it subject the weapon seized to suppression.

¶ 5 With *Wardlow* as a backdrop, the Pennsylvania Supreme Court reversed its initial decision in *D.M. I,* which contained the following facts. D.M. matched the description relayed over police radio of a black man with a gun. Within a block of

---

**1.** 35 P.S. § 780–113(a)(30). Appellant was also convicted by a jury of possession of a controlled substance and disorderly conduct. *See* 35 P.S. § 780–113(a)(16) and 18 Pa.C.S.A. § 5503(b), respectively. However, Appellant

does not challenge the sufficiency of the evidence as to these offenses.

**2.** *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

the dispatch, the police observed the defendant and told him to come over to their police vehicle. The defendant ran from the police, but he was stopped by back up officers that patted him down for their protection. A .32 caliber handgun fell from the defendant's right pants leg, which, once secured, resulted in the defendant's arrest.

¶ 6 On appeal, the Pennsylvania Supreme Court held that the police did not possess reasonable suspicion to stop the defendant, and it reversed the lower courts. On remand from the United States Supreme Court for reconsideration in light of *Wardlow*, the Pennsylvania Supreme Court found that "unprovoked flight in a high crime area is sufficient to create a reasonable suspicion to justify a *Terry* stop under the Fourth Amendment." *D.M. II*, at 450, 781 A.2d at 1164. This translated into a reversal of the Pennsylvania Supreme Court's earlier decision and reinstatement of the order of the Superior Court affirming the judgment of sentence. In the process of reversing, our high Court stated:

> In the instant case, at the time the police initially approached the [A]ppellant it was unclear whether the police intended to do anything other than talk to him. Thus, the initial approach did not need to be justified by any level of suspicion. Rather, the appropriate time to consider whether the police had reasonable suspicion is at the time the police actually effectuated the seizure of the [A]ppellant and the totality of the circumstances test, by its very definition, requires that the whole picture be considered when determining whether the police possessed the requisite cause to stop [A]ppellant. Here, the police effectuated the stop following [A]ppellant's flight from the scene [—a high crime area], thus, [unprovoked] flight was clearly relevant in determining

whether the police demonstrated reasonable suspicion to justify a *Terry* stop under the totality of the circumstances[, which it found to exist].

*D.M. II*, at 452, 781 A.2d at 1165 (citation omitted).

¶ 7 A panel of this Court in *Jefferson* confronted a scenario in which police in marked vehicles were patrolling a neighborhood known for drug sales and the site of a recent shooting. When the police observed Appellant and another man in the street, the men ran away. The police gave chase and observed Appellant toss a bag containing PCP to the ground.

¶ 8 Appellant sought to suppress the evidence seized as violative of state constitutional principles, which required police to establish reasonable suspicion in advance of recovering contraband discarded by a suspect. Appellant conceded that under *Wardlow*, the combination of seeing a defendant in a high crime area and his flight from police merged to establish the *Terry* standard of reasonable suspicion. However, Appellant argued in favor of rejecting the rationale of *Wardlow* as inconsistent with state constitutional law. We refused the offer.

¶ 9 In light of the holding in *D.M. II*, we embraced the rationale of *Wardlow* for state constitutional purposes. As a result, we held that unprovoked flight in a high crime area was sufficient to create a reasonable suspicion to justify a *Terry* stop under both federal and state principles. *Jefferson*, 853 A.2d at 406.

¶ 10 Herein, we now recite the facts stipulated to by the parties and incorporated in full from the *habeas corpus* hearing into the suppression hearing; to-wit: At approximately 10:00 p.m. on the 29th of July, 2004, Norristown Police Officer Daniel DeOrzio was on patrol in an unmarked car, proactively investigating drug activity

in the area with other members of the task force. The police conducted several passes of the 800 block of Green Street, which was known as a "heavy drug area where many drug transactions occur [. . . and] is also a high traffic area[.]" Officer DeOrzio observed Appellant loitering in the vicinity on each pass by police.

¶ 11 Officer DeOrzio thought Appellant resembled somebody that had an active county warrant, and he intended to conduct a pedestrian stop to inquire about Appellant's identity and what he was doing in the area at that time of the evening. Toward that end, Officer DeOrzio exited the unmarked vehicle and stood in the alley between DeKalb and Green Streets while other members of the task force circled the block to the back of Green Street to stop Appellant if he exited there.

¶ 12 Before approaching or saying anything, Officer DeOrzio observed Appellant "sneaking" between two houses, then walking through the backyard of one house into the alley, all the while looking either way for the presence of the unmarked police vehicle that had just left. Officer DeOrzio also described Appellant as crouching down, looking both ways, and starting to walk down the alley toward the officer. At this point, Officer DeOrzio stepped into the alley, said, "Stop," and was clearly identified as a police officer. N.T. Suppression Hearing, 4/25/05 at 17.[3]

¶ 13 Hearing the command to "stop," Appellant immediately froze, and then he turned and ran. Officer DeOrzio gave chase, which pursuit traversed past a dozen homes, a backyard of a house, and a leap over a fence before returning to the alley. During the chase, Appellant's hands were confined to his waist, and he was observed grabbing at his clothes.

¶ 14 Appellant was finally apprehended by an officer of the task force, handcuffed, and later processed at headquarters. Prior thereto, the police retraced the path Appellant took in attempting to flee from police and recovered a Philly blunt cigar lying on the ground. To the right of the cigar was a clear plastic bag containing "a large chunk of white powder" later tested to be cocaine. Despite the fact that the area was saturated from two days of rain, the two items retrieved by police were dry. Appellant was thereafter charged with PWID. *See* footnote 1, *supra.* After a jury trial, Appellant was found guilty as charged. Sentence was imposed, and a timely appeal followed challenging the denial of the motion to suppress and the sufficiency of the evidence. As to the suppression issue, Appellant argues that the fact that the police were not in uniform and driving an unmarked vehicle distinguish this case from *Jefferson* and *D.M. II,* which demands a suppression of the evidence seized. Stated otherwise,

> If [Appellant's] flight is found to be cause for reasonable suspicion, then citizens are obligated to stand still whenever a stranger in plain clothes in an unmarked car approaches and says, "stop."
>
> The ramifications of this are far-reaching and dangerous. Citizens should be obligated to stop only for officers that are clearly identified as such, and only when they are driving cars that are clearly marked.

\* \* \* \*

> [. . .T]he word, "stop," spoken by the officer certainly did amount to a different police presence than a police officer in uniform getting out of a marked car

---

3. Further, Officer DeOrzio was clearly identified as a police officer because he was wearing "a black tee shirt that ha[d] police in three or four inch letters across the chest." N.T. Jury Trial, 4/25/05, at 27.

and approaching a person who flees. [. . .] The [suppression] court erred in the legal conclusion that [Appellant's] flight was unprovoked and that seizure was appropriate. Therefore, evidence obtained as a result of the illegal seizure should have been suppressed.

Appellant's brief, at 13. We disagree.

■ ¶ 15 Consistent with *Jefferson* and *D.M. II,* it is clear that unprovoked flight in a high crime area establish a reasonable suspicion to believe that criminal activity is afoot to allow for a *Terry* stop. To determine whether the police have reasonable suspicion, the totality of the circumstances must be examined. *Commonwealth v. Miller,* 876 A.2d 427, 429 (Pa.Super.2005) (*citing United States v. Cortez,* 449 U.S. 411, 417, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981)). "Based upon that whole picture, the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity." *Id.,* 876 A.2d at 430 (*quoting Cortez,* 449 U.S. at 417–18, 101 S.Ct. 690).

¶ 16 In advance of Officer DeOrzio telling Appellant to "stop," we have a police task force focusing on curbing crime in a location known as a "very high drug area," and Officer DeOrzio observing Appellant loitering at 10:00 p.m. in the 800 block of Green Street. Once Officer DeOrzio exited the unmarked vehicle, he observed Appellant skulking between homes in the neighborhood, looking from side to side as he remained in a crouched position, and all the while walking down the alley toward the plain clothes officer. It was only at this moment that Officer DeOrzio told Appellant to "stop," and he "was clearly identified as a police officer." N.T. Habeas Corpus Hearing, 2/9/05, at 9; N.T. Suppression Hearing, 4/25/05, at 17 ("The officer stepped out into the alley and said stop. He was not clear in his testimony if he said police or not but he thought he had clearly been identified as a police officer."); Trial court opinion, 8/29/05, at 6 ("When Officer DeOrzio, who was identified as a police officer said 'stop' Appellant fled."). This command caused Appellant to freeze momentarily before fleeing the scene with the police in hot pursuit.

■ ¶ 17 In determining whether an officer acted reasonably, "due weight must be given, not to his inchoate and unparticularized suspicion or 'hunch,' but to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience." *Terry,* at 27, 88 S.Ct. at 1883, 20 L.Ed.2d at 909. Police officers may find reasonable suspicion to suspect criminal activity is afoot in a high crime area where an unprovoked citizen flees upon noticing the police. *Jefferson,* 853 A.2d 404; *see also In the Interest of J.G.,* 860 A.2d 185 (Pa.Super.2004).

¶ 18 In this case, as observed by the trial court, "there was no pre-flight seizure. The flight was not provoked by the police, but by Appellant's guilty mind." Trial court opinion, 8/29/05, at 5. More importantly, under *Terry,* the art of good police work would not suggest that Officer DeOrzio just shrug his shoulders and look the other way after observing Appellant engaging in surreptitious activity. On the contrary, *Terry* and its progeny allows for police, be they in uniform or undercover, to approach Appellant to maintain the *status quo* while defusing any reasonable suspicion of criminal activity. At bar, police had an initial purpose to confirm or refute Appellant's warrant status, which blossomed into an inquiry as to Appellant's suspicious, "sneaky" behavior observed by Officer DeOrzio conducted around civilian homes and yards late at night in a high drug area.

¶ 19 In *J.G.,* Appellant was standing in front of a building located in a "high drug

area," but he did not flee upon seeing an unmarked vehicle. Appellant merely started to walk away upon seeing police alight from their vehicle and approach him. We ruled that the absence of flight in a high crime area negated the presence of reasonable suspicion and invalidated the police's *Terry* stop of Appellant, which tainted subsequently seized drugs. *J.G.*, 860 A.2d at 189. In contrast here, Appellant fled upon hearing Officer DeOrzio's command to stop in a high crime area. Ergo, we find that reasonable suspicion existed to conduct a *Terry* stop. *Commonwealth v. Miller*, 876 A.2d 427, 430 (Pa.Super.2005) ("Although mere presence in a high crime area is insufficient to support a *Terry* stop, the additional factor of unprovoked flight is sufficient to satisfy the *Terry* standard of reasonable suspicion."). As a result, the ultimate seizure of drugs discarded during the chase is not subject to suppression. *Wardlow*, 528 U.S. 119, 120 S.Ct. 673, 145 L.Ed.2d 570; *D.M. II*, 566 Pa. 445, 781 A.2d 1161; and *Jefferson.*

■ ¶ 20 We next turn to Appellant's complaint that the evidence was insufficient to sustain his conviction for PWID. Our standard of review when examining a sufficiency of the evidence claim has been recited as follows:

> The standard we apply in reviewing the sufficiency of evidence is whether, viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact[-]finder to find every element of the crime beyond a reasonable doubt. In applying the above test, we may not weigh the evidence and substitute our judgment for that of the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth may not preclude every

possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the trier of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

*Commonwealth v. Lambert*, 795 A.2d 1010, 1014–1015 (Pa.Super.2002) (citations omitted). With respect to sufficiency cases involving PWID, *Commonwealth v. Jackson*, 435 Pa.Super. 410, 645 A.2d 1366, 1368 (1994), is instructive:

> The Commonwealth must prove both the possession of the controlled substance and the intent to deliver the controlled substance. It is well settled that all the facts and circumstances surrounding possession are relevant in making a determination of whether contraband was possessed with intent to deliver.

> In Pennsylvania, the intent to deliver may be inferred from possession of a large quantity of controlled substance. It follows that possession of a small amount of a controlled substance supports the conclusion that there is an absence of intent to deliver.

Notably, "if, when considering only the quantity of a controlled substance, it is not clear whether the substance is being used for personal consumption or distri-

bution, it then becomes necessary to analyze other factors."

*Commonwealth v. Ratsamy*, 885 A.2d 1005, 1007–1008 (Pa.Super.2005) (citations omitted).

¶ 21 In the present case, the parties stipulated to the qualifications of Norristown Police Sergeant William Tims as an expert for the Commonwealth regarding the charge of PWID.

¶ 22 Sergeant Tims was on duty on the night in question and arrived on the scene after Appellant had been handcuffed. Upon being advised of the chase, Sergeant Tims and three other officers retraced Appellant's flight. The police recovered a Philly blunt cigar lying on the ground, and next to it was a clear plastic bag that was knotted and contained a large chunk (5.71 grams) [4] of white powder later tested to be cocaine. Of interest to the sergeant was the fact that it had rained most of the day, but the two items found were completely dry. N.T. Habeas Corpus Hearing, 2/9/05, at 22.

¶ 23 Money amounting to $308 was seized from Appellant and the currency was divided into denominations of tens and twenties. Yet, Appellant told police he was unemployed. Appellant was also observed in "a very high drug area" at 10:00 p.m. Add to this plethora of information the fact that Sergeant Tims was a member of the "CLEAN" squad, which entails quality of life crimes and doing video surveillance of drug activity. As a member of the "CLEAN" squad, Sergeant Tims participated in numerous "video surveillance on different drug dealers in the area[, and he had] knowledge of [Appellant] and his activities[ ]" as a result thereof. N.T. Habeas Corpus Hearing, 2/9/05, at 23.

¶ 24 Prior to offering an opinion, Sergeant Tims noticed that the bag contained a very large chunk of "rock" cocaine. He also testified that, "It's not uncommon for people in their dealing drugs, to get the big chunk of rock, they'll cut it down. They step on it or cook it up with annestitol (ph.) and whatnot, to make the product go further to make more money off the product." N.T. Habeas Corpus Hearing, 2/9/05, at 23–24. All of the preceding was the predicate for the expert to opine that Appellant "intended to package [the cocaine] and to sell it." *Id.* at 24. We find no fault with this determination and join in the trial court's ruling that "there was sufficient evidence to establish that Appellant exercised conscious dominion and control over the contraband found in the path of the chase and that Appellant intended the cocaine for sale." Trial court opinion, 8/29/05, at 8. *Contrast Ratsamy*, 885 A.2d at 1008 (aside from the size of the "rock" (6.2 grams) found on Appellant's person, there was no other evidence to establish that he possessed it for the purpose of sale: "Appellant possessed no paraphernalia commonly found in the distribution of crack cocaine, Appellant was not seen distributing drugs to another nor was there any testimony from someone indicating that they had previously purchased drugs from Appellant." As a result, the judgment of sentence for PWID was reversed).

¶ 25 Accordingly, finding no merit to either Appellant's motion to suppress or sufficiency claim, we affirm the judgment of sentence.

¶ 26 Judgment of sentence affirmed.

---

4. The weight of the controlled substance constituted more than an eight ball. N.T. Habeas

Corpus Hearing, 2/9/05, at 24–25.