J-A13043-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN THE INTEREST OF: R.L.J., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: R.L.J. | |
| | No. 798 WDA 2014 |

Appeal from the Order April 15, 2014
In the Court of Common Pleas of Allegheny County
Juvenile Division at No(s): No. 1849-09

BEFORE:  PANELLA, J., SHOGAN, J., and OTT, J.

MEMORANDUM BY OTT, J.:                          **FILED JUNE 30, 2015**

R.L.J. ("R.J.") appeals from the dispositional order entered following an adjudication of delinquency for the offenses of possession of a firearm with an altered manufacturer's number, carrying a firearm without a license, and possession of a firearm by a minor.[1, 2]  On appeal, R.J. raises two issues: (1) "Did law enforcement fail to present objective evidence of reasonable suspicion to perform an investigative detention of R.J. when the police failed to sufficiently prove that R.J. was the person who ran from police in a high crime area," and (2) "Was the identification evidence insufficient beyond a reasonable doubt when police identified R.J. as the suspect because he stood

_____

[1] 18 Pa.C.S. §§ 6110.2(a), 6106(a)(1), and 6110.1(a), respectively.

[2] On April 15, 2014, R.J. was committed to Mid Atlantic Youth Services.

in the backyard of fifteen row houses, considering that the police never saw the suspect's face, could not describe the suspect in any detail, and lost sight of the suspect when he or she ran behind the fifteen row houses?" R.J.'s Brief at 8.[3] Based upon the following, we affirm.

Prior to the adjudication hearing, R.J. filed a motion to suppress, which was denied by the juvenile court. The facts adduced at the suppression hearing were set forth in the juvenile court's findings of fact:

1. On the date in question, the police officer in the case was on routine patrol in the area of Mon View Heights.

2. This area is known by the police to be a high-crime area for both drugs and violence. While on patrol in this area, the police officer observed a person wearing dark clothes, with a hoody, cross the roadway in front of his marked vehicle. The individual was wearing a hoody with the hood up.

3. This person turned, viewed the patrol car, and began to hurry away from the area. Thereafter, he turned and looked back at the patrol car and began to run around a building in the area.

4. The officer drove around the building and around the block. He stopped the car, exited, and walked through the building tunnel, which was a passageway described in the record of being able to gain access from the front to the back area of the building, which the police officer described as almost like a yard-type landscape.

5. Upon turning the corner, the officer saw a person who matched the clothing and description of the person he saw running from the patrol car.

_____

[3] R.J. timely complied with the order of the juvenile court to file a Pa.R.A.P. 1925(b) statement of errors complained of on appeal.

6. The Officer, due to the late hour, the darkness, the flight and his inability to see the person's hands, asked him to raise his hands for the officer's safety.

7. Upon raising his hands, the Officer saw in plain view a pistol in the waistband of the juvenile.

8. There were no other people seen in the area at this time.

9. Given the high-crime area, the flight of the person that matched the description of the person he saw running earlier, and the inability to see that person's hands, the officer was within his rights to ask for the minimal intrusion for officer's safety for the raising of the juvenile's hands. Thereafter, the weapon was in plain view and properly seized.

Juvenile Court Opinion, 12/19/2014, at 1–2.

R.J. first challenges the court's suppression ruling. Specifically, R.J. contends that the officer lacked reasonable suspicion to stop him because "in the present case, the officer was not justified in his belief that R.J. was the suspect." R.J.'s Brief at 20. R.J. asserts the Commonwealth's evidence only showed:

> R.J. was merely standing in the backyard area of the fifteen row houses. There was no indication that he had just run from police or that police could provide any sufficient identifying information that connected R.J. to the fleeing suspect, other than R.J. stood outside in the general area where the suspect had run and he wore nondescript dark clothes.

R.J.'s Brief, *id.*

Our standard of review is as follows:

> Our standard of review in addressing a challenge to the denial of a suppression motion is
>
> > limited to determining whether the suppression court's factual findings are supported by the record and whether

the legal conclusions drawn from those facts are correct. Because the Commonwealth prevailed before the suppression court, we may consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the suppression court's factual findings are supported by the record, we are bound by these findings and may reverse only if the court's legal conclusions are erroneous. The suppression court's legal conclusions are not binding on an appellate court, whose duty it is to determine if the suppression court properly applied the law to the facts. Thus, the conclusions of law of the courts below are subject to our plenary review.

*Commonwealth v. Jones*, 605 Pa. 188, 988 A.2d 649, 654 (Pa. 2010), *cert. denied*, 562 U.S. 832, 131 S. Ct. 110, 178 L. Ed. 2d 32 (U.S. 2010) (citations, quotations and ellipses omitted). Moreover, appellate courts are limited to reviewing only the evidence presented at the suppression hearing when examining a ruling on a pre-trial motion to suppress. *See In the Interest of L.J.*, 79 A.3d 1073, 1083-1087 (Pa. 2013).

*Commonwealth v. Ranson*, 103 A.3d 73, 76 (Pa. Super. 2013), *appeal denied*, ___ Pa. ___ (Pa. May 13, 2015). "It is within the suppression court's sole province as factfinder to pass on the credibility of witnesses and the weight to be given their testimony." *Commonwealth v. Clemens*, 66 A.3d 373, 378 (Pa. Super. 2013) (quotations and citation omitted).

Our law recognizes three levels of police interaction with civilians. "The first is a mere encounter, which requires no level of suspicion at all. The second level is an investigative detention, which must be supported by reasonable suspicion. Finally, the third level is an arrest or custodial detention, which must be supported by probable cause." *Commonwealth*

*v. Walls*, 53 A.3d 889, 892–893 (Pa. Super. 2012) (citation omitted).

Regarding an investigative detention:

> In the seminal case of *Terry v. Ohio*, 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968), the United States Supreme Court indicated that police may stop and frisk a person where they had a reasonable suspicion that criminal activity is afoot. In order to determine whether the police had a reasonable suspicion, the totality of the circumstances – the whole picture – must be considered. Based upon that whole picture the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity.

*In the Interest of D.M.*, 781 A.2d 1161, 1163 (Pa. 2001) (citations omitted). Unprovoked flight in a high-crime area from persons identifiable as police officers is sufficient to establish reasonable suspicion to support an investigative detention. *Commonwealth v. Jefferson*, 853 A.2d 404 (Pa. Super. 2004). *See also Commonwealth v. Brown*, 904 A.2d 925 (Pa. Super. 2006).

At the suppression hearing, Officer David Haines, of the Mifflin Police Department, testified that on March 3, 2014, he was by himself, in uniform and in a marked vehicle, patrolling the Mon View Heights housing project. N.T., 3/20/2014, at 6. He further testified:

> Q. Did anything unusual happen during your shift?
>
> A. Yes. As I was driving on the property towards the 31 row, which is in the back of the complex, *I saw a person in dark clothing with a hood over his head cross in front of me. When that person looked in my direction, he began to run.*
>
> As I got closer, the person looked back again and increased his speed, and he ran and continued to run and ran behind the 31 row apartment building.

- 5 -

\*\*\*\*

THE COURT: Okay. You were driving?

THE WITNESS: I was driving.

THE COURT: He came across. Go ahead. Tell me.

THE WITNESS: He was probably about 150 feet ahead of me.

THE COURT: Okay.

THE WITNESS: As I continued to a location, as he looked back and looked at my vehicle, he ran.

***When he got to the rear at the 31 row building, he looked back again, and he ran and turned to the left and ran behind the building.***

[BY COMMONWEALTH'S ATTORNEY]:

Q. Okay. Can you describe this area.

A. It's a residential area. It's a private property. There's a front gate that's monitored by guards.

We have a huge amount of crime in this complex, especially in the area that I saw this individual. Anything from homicides to drugs to burglaries, robberies. We have – almost on a daily basis we are up there at that area a couple of times.

Q. You called it a residential area. Is it homes, row houses, apartment buildings?

A. It's row houses.

Q. Okay. What time was this?

A. This was 12:08 a.m.

Q. ***Was anybody else around in the area that you could observe?***

A. ***No. I didn't see anybody else.***

\*\*\*\*

Q. Okay.  He's at this point about 150 feet away.

A.  He's probably about 100-to-150 feet in front of me to my right.

Q. Okay.  Where was he located exactly?

A.  To the right.  When I initially saw him, he had just crossed the road.  He walked across the road and looked in my direction as I was approaching.  As soon as he looked in my direction, he began to run.

As I closed the distance, he continued to run.  But then he looked back again, and he ran harder and made the left behind the complex of buildings.

Q. Prior to him running, how fast was that person going?

A. He was just walking.

Q. Okay.  Was anything else around?  Any other cars on the street?

A. Yes.  There are cars parked on the street.

Q. Any other moving vehicles that you recall?

A. No.

Q. At that point did you make eye contact?

A. No.

Q. Okay. You said when that person first looked in your direction, he started running?

A. Correct.

Q. Where was the person when he first looked in your direction? What part of the street?

A. Immediately to the right side of the street. He had just crossed the street from my left to my right. Once he got to the other side of the street, he looked in my direction. As soon as he looked in my direction, he began to run.

****

Q. Where was that person when he looked back a second time?

A. He was approximately 75 feet to my right near the rear of the 31 building.

Q. Okay. Then you said that the pace was increased?

A. Yes.

Q. How fast was that person going at that time?

A. It appeared to be a full sprint.

Q. How far did that person sprint?

A. I lost sight of him after probably about 15 feet once he turned the corner of the 31 row building.

Q. ***Were there other people around?***

A. ***Not that I recall.***

Q. What is the lighting in this area?

A. It's very poor. It's hard to –

THE COURT: Very poor?

THE WITNESS: Yes.

A. I mean there's some lights, but it depends on which area you're in. At times it can be poor. At times it can be okay. Depends on whether you're right underneath the street light.

Q. What about the area you were in?

A. **When I initially saw him, it was fair. There was snow on the ground, so, it was brighter than what it usually is.**

\*\*\*\*

Q. Okay. You said that the person that you saw – now I'm shifting back. I apologize. The person that you saw was wearing what?

A. **Dark clothing. I couldn't make out a color other than it was dark. There was a hood. He had a hood on his head.**

Q. Was the hood up or down?

A. It was up.

Q. Okay. Once that person went into a sprint you said for about 15 feet, what happened?

A. **I lost sight of the person behind the building.**

Q. **What building?**

A. **31 row**.

Q. Okay.

A. **I continued to drive to the middle part of the building. The building has probably 15 residences.**

Q. Okay.

A. Individual residences in there. **Halfway in between there's what we call a tunnel. It's a passageway that leads to the rear of the building.**

Q. You … call it a tunnel?

A. We call it a tunnel.

Q. Is it covered?

A. Yes.

Q. Okay.

A. I mean, it's an open passageway that would lead directly from the front to the back of the building.

Q. Okay. I'm sorry. Did the person go through that or did you or both?

A. … I went through.

Q. Okay. What happened?

A. *As I walked through the tunnel, as soon as I turned the corner, I came face-to-face with the individual probably ten feet away.*

Q. Okay. Now, you said you turned the corner. Did you turn right or left?

A. Turned right.

Q. As you turn right out of the tunnel, describe that area.

A. It's just a backyard. It's a small backyard area that runs the length of the building. It was snow covered at the time.

Q. *Was anybody else around?*

A. *No.*

Q. What was that person doing?

A. He stopped. I think we were both surprised to see each other so close in proximity at the time.

Q. Which direction was the person facing?

A. He was facing right directly at me.

Q. Did you make eye contact?

A. Yes.

Q. What was he doing?

A. He stood there. I couldn't see his hands. I told him to put his hands up to where I could see them. I told him to put his hands up to his head. As soon as he put his hands up, I saw a large silver handgun in his waistband.

N.T., 3/20/2014, at 6–12, 15–18 (emphasis added). At the suppression hearing, Officer Haines identified R.J. as the juvenile he had encountered with the firearm. *Id.* at 23–24.

The juvenile court, in its Pa.R.A.P. 1925(a) opinion, after discussing the relevant case law, explained its rationale for denying the suppression motion:

In the present case a police officer was on routine patrol in an area that he described as a high crime area. As he was patrolling a residential apartment building he saw a young black male walking through the area. The young black male turned and looked directly at the police officer at which point he turned around and began to run.

As the police officer turned his vehicle to attempt to apprehend the individual he drove around the building[. He exited and walked through the building tunnel,] and saw the person he recognized as the same individual that fled upon seeing the police car.

The officer [] ordered the juvenile to stop and raise his hands. Upon raising his hands in plain view was a firearm. The officer's conduct was much less than a *Terry*[4] pat-down. He merely instructed the juvenile to stop and raise his hands for the officer's safety. Upon raising his hands in plain view was a weapon. The case law is clear that not only was he justified in taking the actions that he did, the officer could have, based upon

_____

[4] *Terry v. Ohio*, 392 U.S. 1 (1968).

- 11 -

> unprovoked flight in a high crime area, conducted a pat-down of the juvenile. Given the minimal intrusion upon the juvenile coupled with the unprovoked flight and high crime area, the officer was well within his authority to take the action that he did. Therefore, the stop was in fact lawful and the adjudication that followed pursuant to [the parties' stipulation to incorporate the testimony from the suppression hearing] was clearly based on and supported by record evidence.

Juvenile Court Opinion, 12/19/14, at 6.

R.J. maintains, however, that "[b]ased on the officer's testimony, **he did not see the person's face.**" R.J.'s Brief at 17 (emphasis in the original), *citing* N.T., 3/20/2014, at 26. R.J. states that "[the] evidence failed to provide sufficient information to allow the officer to reasonably conclude that R.J. was the person who fled from the officer while he patrolled the area." R.J.'s Brief at 19. R.J. asserts he was "merely standing in the backyard of the fifteen row houses," that there was no evidence "that [he] was sweating, panting, shaking, or doubled over, or any other evidence indicating [he] had recently sprinted away from police[,]" and there was "no indication how quickly the officer traveled behind the houses and what abutted the backyard of the row houses." R.J.'s Brief at 20–21.

We find no error in the juvenile court's ruling. The court was free to weigh and credit Officer Haines's testimony that at the back of the building he encountered the suspect who had run away from him initially. **See Clemens, supra**. Given Officer Haines's observations of the suspect's clothing, the absence of other persons in the vicinity, the area and direction in which the suspect fled, and the location where Officer Haines came upon

R.J., the record supports the court's determination that Officer Haines had reasonable suspicion to stop R.J. **See Jefferson, supra**.

R.J.'s argument is essentially a challenge to the juvenile court's findings of fact. As stated above, we are bound by the court's findings of fact if they are supported by the record. **Ranson**, 103 A.3d at 76. We have determined that the court's findings of fact are supported by the evidence, and so we are bound by them. Consequently, R.J.'s argument cannot succeed.[5]

Accordingly, in light of our standard of review, we will not disturb the court's decision that denied the motion to suppress.

Next, R.J. challenges the sufficiency of the identification evidence to sustain the adjudication of delinquency for the offenses of possession of a firearm with an altered manufacturer's number, carrying a firearm without a license, and possession of a firearm by a minor.[6] R.J. argues:

_____

[5] Even if R.J. was actually the wrong person, the court's conclusion that the officer had reasonable suspicion for suspecting that R.J. was the individual who fled from him is supported by the evidence of record, as discussed above.

[6] Section 6110.2 of the Crimes Codes provides, in relevant part, that "No person shall possess a firearm which has had the manufacturer's number integral to the frame or receiver altered, changed, removed or obliterated." 18 Pa.C.S. § 6110.2(a). Under Section 6106(a)(1) of the Crimes Code, "Except as provided in paragraph (2), … any person who carries a firearm concealed on or about his person, except in his place of abode or fixed place of business, without a valid and lawfully issued license under this chapter commits a felony of the third degree." 18 Pa.C.S. § 6106(a)(1). Finally, Section 6110.1 provides, in relevant part: "Except as provided in subsection
*(Footnote Continued Next Page)*

- 13 -

The identification evidence was insufficient beyond a reasonable doubt when the police identified R.J. as the suspect because he stood in the backyard of fifteen row houses, even though the police never saw the suspect's face, could not describe the suspect in any detail, and lost sight of the suspect when he or she ran behind the fifteen row houses.

R.J.'s Brief at 23. R.J. maintains "[t]he evidence presented here supports nothing more than a guess." *Id.* at 27. *See also id.* at 24.

Our standard of review is well settled:

In reviewing sufficiency of evidence claims, we must determine whether the evidence admitted at trial, as well as all reasonable inferences drawn therefrom, when viewed in the light most favorable to the verdict winner, are sufficient to support all the elements of the offense. Additionally, to sustain a conviction, the facts and circumstances which the Commonwealth must prove[] must be such that every essential element of the crime is established beyond a reasonable doubt. Admittedly, guilt must be based on facts and conditions proved, and not on suspicion or surmise. Entirely circumstantial evidence is sufficient so long as the combination of the evidence links the accused to the crime beyond a reasonable doubt. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The fact[-]finder is free to believe all, part, or none of the evidence presented at trial.

*Commonwealth v. K.A.T.*, 69 A.3d 691, 696 (Pa. Super. 2013) (citation omitted). "While attacks upon identification testimony normally go to the

*(Footnote Continued)* ──────────────────

(b), a person under 18 years of age shall not possess or transport a firearm anywhere in this Commonwealth." 18 Pa.C.S. § 6110.1(a).

weight of the evidence and not to the sufficiency of the evidence, it has further been stated that where the identification evidence is demonstrated to be so inherently unreliable as to make a verdict based upon it one of conjecture or surmise, it will be found insufficient." ***Commonwealth v. Orr***, 38 A.3d 868, 878 (Pa. Super. 2011) (footnote omitted).

We find no merit in R.J.'s argument. As discussed above, we have concluded the juvenile court properly determined the stop of R.J. was lawful. When R.J. was lawfully stopped, he was found to be in possession of a firearm. At the suppression hearing, Officer Haines positively identified R.J. as the individual that he had encountered with a firearm, and this testimony was incorporated into the adjudication hearing. ***See*** N.T., 3/20/2014, at 23–24; ***See*** N.T., 3/25/2014, at 7–8. Therefore, the identification evidence was sufficient to sustain the adjudication of delinquency beyond a reasonable doubt. ***See Commonwealth v. K.A.T., supra***. Therefore, R.J.'s sufficiency challenge regarding identification evidence fails.

Dispositional order affirmed.

Judgment Entered.

_Joseph D. Seletyn_

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>6/30/2015</u>