J-S57045-17

**NON-PRECEDENTIAL DECISION – SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| v. | : | |
| | : | |
| CARLTON FITZGERALD JOHNSON, | : | |
| | : | |
| Appellant | : | No. 1283 EDA 2016 |

Appeal from the Judgment of Sentence March 22, 2016
in the Court of Common Pleas of Philadelphia County,
Criminal Division, No(s): CP-51-CR-0014992-2013

BEFORE: PANELLA, SOLANO and MUSMANNO, J.

MEMORANDUM BY MUSMANNO, J.:　　　　　**FILED NOVEMBER 16, 2017**

Carlton Fitzgerald Johnson ("Johnson") appeals from the judgment of sentence imposed following his convictions of persons not to possess firearms, firearms not to be carried without a license, carrying firearms on public streets in Philadelphia, and possession of a small amount of marijuana.[1]  We affirm.

The trial court set forth the relevant facts underlying this appeal as follows:

> On November 15, 2013[,] at approximately 6:30 pm, Officer [Jeffrey] O'Palski [("Officer O'Palski")] was on patrol with his partner, Officer Mundrick,[2] in the area of 1600 North Allison Street in Philadelphia, Pennsylvania.  N.T. [(suppression hearing),] 4/29/1[4,] at 8.  Based on his experience as a Five Squad officer in the 19th District, Officer O'Palski testified that "1600 North Allison is a crime-ridden area, it's a big gang area,

---

[1] **See** 18 Pa.C.S.A. §§ 6105(a)(1), 6106(a)(1), 6108; 35 P.S. § 780-113(a)(31).

[2] Officer Mundrick's first name is not revealed in the certified record.

right off Lansdowne Avenue; high crime, shootings, robberies, drugs, drug sales, and drug use." *Id.* at 8. While traveling eastbound in a marked squad car, the officers observed [Johnson] standing on the southwest corner of Allison and Lansdowne Streets. *Id.* at 9.

After looking in the direction of the officers, [Johnson] immediately began running southbound on the 1500 block of Allison Street. *Id.* at 9. In response to [Johnson's] abrupt departure, Officer O'Palski turned his vehicle around the corner, then pulled up alongside [Johnson], who stopped and placed his hands above his head. *Id.* at 1[0]. Officer O'Palski observed that [Johnson] was wearing an orange and white glove on his right hand, but did not have one on his left. *Id.* [] Officer O'Palski asked [Johnson] if everything was okay; [Johnson] responded that his baby was having a medical emergency. *Id.* [] The officers exited their vehicle and approached [Johnson] to see if he needed rescue or medical attention. *Id.*

At that time, Officer O'Palski detected a strong odor of alcohol coming from [Johnson's] breath. *Id.* [Johnson] told the officers that his baby was inside a house on the block of 1500 Allison Street. *Id.* The officers stayed at the location while [Johnson] went inside the house[,] in case he was in need of assistance. *Id.* After opening the front door of the house and peeking his head in for two or three seconds, [Johnson] looked at the officers and told them that he was "good." *Id.* At that time, the officers returned to their patrol car and continued southbound on Allison Street, rounding the block to continue eastbound on Lansdowne Avenue to their original route. *Id.* at 11. As they reached the intersection of Allison and Lansdowne[,] roughly one minute later, the officers once again observed [Johnson]. *Id.* This time, [Johnson] was on the east side of the 1600 block of Allison Street, quickly walking northbound. *Id.* Officer O'Palski pulled the patrol vehicle alongside [Johnson] for the second time, then asked him how his baby was doing. *Id.* [Johnson] stated that the baby had stopped breathing, but that they gave the baby something and he was okay. *Id.*

From his vantage point inside the vehicle (roughly 10-15 feet from [Johnson]), Officer O'Palski noticed that [Johnson] had a very large object in his right [front] pants pocket. *Id.* He testified that the object was long in size and seemed to be heavy, as [Johnson's] right side pocket was sagging down longer

on the right side than it was on the left. *Id.* at 12. Officer O'Palski also observed that [Johnson] had his right hand partially inside of his pocket, but not all the way in, as it seemed as though he was unable to fully fit his hand inside of his pocket. *Id.* Officer Mundrick asked [Johnson] to remove his hand from his pocket. *Id.* [] In response, [according to Officer O'Palski, Johnson] "bent down slightly, crouched forward, bent the waist down towards the right side and he side-stepped away and said, 'we're cool, we're cool.'" *Id.* Officer O'Palski testified that based on his experience with firearms and people who illegally carry them on the street, [Johnson's] behavior was indicative of the fact that he had a firearm. *Id.*

After making these observations, Officer O'Palski and [Officer Mundrick] exited the vehicle. *Id.* at 13. Officer Mundrick approached [Johnson] from behind to perform a frisk[,] while Officer O'Palski approached him from the front. *Id.* While performing the frisk, Officer Mundrick touched [Johnson's] right pocket, then immediately yelled "gun." *Id.* at 14. The officers then removed [Johnson's] hands from the area, at which point they recovered a 9[-]millimeter semiautomatic handgun. *Id.* After determining that [Johnson] did not have a license to carry a firearm, the officers placed him under arrest. *Id.* at 15. In addition to the weapon, the officers also recovered two yellow-tinted bags containing a green, "weedy, seedy" substance that tested positive for marijuana[,] along with the orange and white glove that was worn by [Johnson]. *Id.* at 13.

Trial Court Opinion, 2/17/17, at 1-3 (footnote added).

Following his arrest, the Commonwealth charged Johnson with the above-mentioned offenses. Johnson thereafter filed a Motion to suppress the contraband seized from his person, asserting that the police lacked reasonable suspicion to stop and frisk him. The Commonwealth responded that the officers possessed reasonable suspicion, and the search was a lawful protective frisk for weapons, pursuant to *Terry v. Ohio*, 392 U.S. 1 (1968). After a suppression hearing, the trial court denied the Motion to

suppress. Johnson subsequently filed a Motion to reconsider the suppression ruling, which the trial court denied, by operation of law.

The matter proceeded to a non-jury trial, at the close of which the trial court convicted Johnson on all counts. On March 22, 2016, the trial court sentenced Johnson to an aggregate term of five to ten years in prison, followed by five years of probation. Johnson timely filed a Notice of Appeal. In response, the trial court ordered him to file a Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal. Johnson timely filed a Concise Statement.

Johnson now presents the following question for our review:

> Did not the [trial] court err by denying [Johnson's M]otion to suppress physical evidence, where [Johnson] was subjected to an investigatory detention and frisk without reasonable suspicion that he was engaged in criminal activity, in violation of both the federal and state constitutions, inasmuch as he was stopped and frisked solely on the basis of a bulge in his pants[] pocket[,] while in a high crime area[,] after police officers had already engaged in conversation with him one minute earlier and left the area, and no behavior on the part of [Johnson] could have led them to reasonably conclude that he was, or had been, engaged in any criminal activity?

Brief for Appellant at 3.

In reviewing a challenge to a trial court's denial of a motion to suppress, "[o]ur standard of review … is limited to determining whether the factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct." *Commonwealth v. Kearney*, 92 A.3d 51, 65 (Pa. Super. 2014). "In making this determination,

we may consider only the evidence of the prosecution's witnesses and so much of the defense as, fairly read in the context of the record as a whole, remains uncontradicted." **Commonwealth v. Page**, 59 A.3d 1118, 1131 (Pa. Super. 2013) (citation omitted). "Where the record supports the factual findings of the trial court, the appellate court is bound by those facts and may reverse only if the legal conclusions drawn therefrom are in error." **Commonwealth v. Caple**, 121 A.3d 511, 516-17 (Pa. Super. 2015). "With respect to factual findings, … is the sole province of the suppression court to weigh the credibility of the witnesses. Further, the suppression court judge is entitled to believe all, part or none of the evidence presented." **Id.** (citation omitted); **see also Commonwealth v. Camacho**, 625 A.2d 1242, 1245 (Pa. Super. 1993) (stating that an appellate court will not reverse a suppression court's assessment of credibility absent a manifest abuse of discretion).

Regarding frisks under **Terry**, **supra**, this Court has observed as follows:

> [I]t is hornbook law that the Fourth Amendment to the United States Constitution[,] as well as Article I, § 8 of the Pennsylvania Constitution[,] protect citizens from unreasonable searches and seizures. Warrantless searches and seizures (such as occurred in this case) are unreasonable *per se*, unless conducted pursuant to specifically established and well-delineated exceptions to the warrant requirement. One such exception, the **Terry** "stop and frisk," permits a police officer to briefly detain a citizen for investigatory purposes if the officer observes unusual conduct which leads him to reasonably conclude, in light of his experience, that criminal activity may be afoot. **Terry** further held that when an officer is justified in believing that the

individual[,] whose suspicious behavior he is investigating at close range[,] is armed and presently dangerous to the officer or to others[,] the officer may conduct a pat[-]down search to determine whether the person is in fact carrying a weapon. The purpose of this limited search is not to discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence.

In order to conduct an investigatory stop, the police must have reasonable suspicion that criminal activity is afoot. In order to determine whether the police had reasonable suspicion, the totality of the circumstances — the whole picture — must be considered. Based upon that whole picture[,] the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity. To conduct a pat down for weapons, a limited search or "frisk" of the suspect, the officer must reasonably believe that his safety or the safety of others is threatened.

*Commonwealth v. Simmons*, 17 A.3d 399, 402-03 (Pa. Super. 2011) (internal citations, quotation marks, and some paragraph breaks omitted). However, "[t]he officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or the safety of others was in danger." *Commonwealth v. Taylor*, 771 A.2d 1261, 1268-69 (Pa. 2001); *see also Commonwealth v. Caban*, 60 A.3d 120, 129 (Pa. Super. 2012) (stating that "[w]hen considering the totality of the circumstances, we need not limit our inquiry to only those facts that clearly and unmistakably indicate criminal conduct. Instead, even a combination of innocent facts, when taken together, may warrant further investigation by the police officer." (citations and quotation marks omitted)). Moreover, in conducting a reasonable suspicion inquiry, a suppression court is required to

"afford due weight to the specific, reasonable inferences drawn from the facts in light of the officer's experience[.]" **Commonwealth v. Brown**, 996 A.2d 473, 477 (Pa. 2010).

Johnson argues that the **Terry** frisk[3] of his person was unlawful, and the contraband seized from that frisk should have thus been suppressed, because the police lacked reasonable suspicion that he was engaged in criminal activity. **See** Brief for Appellant at 17-24. Johnson asserts that "[t]he fact that [he] was merely present in a 'high crime area' … in no way establishes his involvement in criminal activity." **Id.** at 18 (citing **Commonwealth v. Kearney**, 601 A.2d 346, 348 (Pa. Super. 1992) (stating that "[m]ere presence near a high crime area or in the vicinity of a recently reported crime, is not enough to warrant a **Terry** stop.")). Moreover, according to Johnson, his

> actions of side-stepping away from the officers and saying 'we cool, we cool,' similarly does not constitute reasonable suspicion of his involvement in criminal activity. **See** [**Commonwealth v. Key**], 789 A.2d [282,] 289-[]90 [(Pa. Super. 2001)] (appellant's act of ceasing to talk to his companion and turning and walking away upon observing the officers watching him, does not constitute reasonable suspicion of appellant's involvement in criminal activity).

Brief for Appellant at 18-19. Johnson additionally emphasizes that "Officer O'Palski testified that he did not suspect [] Johnson of any crime during his

---

[3] It is undisputed that the stop and frisk of Johnson was an investigative detention by the police.

- 7 -

first interaction with [Johnson]." ***Id.*** at 19 (citing N.T., 4/29/14, at 23).

Finally, Johnson argues that

> Officer O'Palski's observation of a large object in [] Johnson's pants does not create a basis for finding reasonable suspicion of criminal activity. The only reason that Officer O'Palski provided for thinking that [] Johnson possessed a gun was that [] Johnson bent slightly to the right. It is, thus, clear that Officer O'Palski's belief was based on a hunch and nothing more.

Brief for Appellant at 21 (citation to record omitted).

The record reveals that at the time of the incident, Officer O'Palski had nearly four years of experience as a police officer. N.T., 4/29/14, at 7. He is a member of the "Five Squad," which is a "proactive" squad that focuses on known high-crime areas. ***Id.*** Officer O'Palski previously had completed specific concealed weapons training through the Institute of Law Enforcement Education. ***Id.*** at 17. Additionally, he had made between 40-50 prior firearms arrests at the time of the suppression hearing. ***Id.*** at 18.

Officer O'Palski testified that, on the date in question, he and Officer Mundrick were on patrol, in a marked police cruiser, in an area known for narcotics trafficking and gun violence, at 6:30 p.m. ***Id.*** at 7, 8. Officer O'Palski observed Johnson standing on a street corner. ***Id.*** at 9. At that time, Johnson looked in the direction of the police car and immediately started running in the opposite direction. ***Id.*** In response to Johnson's flight, Officer O'Palski pulled the police cruiser up alongside Johnson, who stopped and placed his hands above his head. ***Id.*** at 10. Officer O'Palski asked Johnson if everything was okay, in response to which Johnson stated

that his baby was sick, and that the baby was currently inside of a nearby residence. *Id.* While Johnson went into the residence in question to purportedly check on the baby, the officers stayed on the scene in case Johnson or his child required any additional assistance. *Id.* However, after sticking his head inside the house for a few seconds, Johnson told the officers that all was well. *Id.* The officers then left and continued on their patrol route. *Id.* at 11.

Approximately one minute later, however, the officers again saw Johnson on the street, and pulled up alongside him to inquire how his baby was doing. *Id.* At that time, from his vantage point of approximately 10-15 feet away from Johnson, Officer O'Palski noticed a "very large" bulge in Johnson's right front pants pocket. *Id.* Officer O'Palski could tell that the object was long, approximately six inches in length, and appeared to be heavy, as Johnson's pants pocket was sagging down longer on the right side than it was on the left side. *Id.* at 11-12, 36. Officer O'Palski also observed that Johnson's right hand was only partially inside of his right front pocket, as, it appeared to Officer O'Palski, Johnson was unable to fully fit his hand inside of his pocket due to the large object contained therein. *Id.* at 12. Officer Mundrick then asked Johnson to remove his hand from his pocket. *Id.* In response, Johnson "bent down slightly, crouched forward, ben[t] the waist down towards the right side and he side-stepped away and said, 'we're cool, we're cool.'" *Id.* Officer O'Palski testified that based on his training

and prior experience with concealed firearms arrests, Johnson's behavior in this regard tended to suggest that he was carrying a firearm. *Id.* The officers then stopped Johnson, performed a protective *Terry* frisk, and discovered an unlicensed handgun in Johnson's right front pants pocket, as well as marijuana. *Id.* at 13-15.

Based upon the totality of the above circumstances, we conclude that Officer O'Palski had a particularized and objective basis for reasonably suspecting that Johnson was engaged in criminal activity. The following facts are particularly relevant: the location of the incident in a known high-crime area, Johnson's unprovoked flight immediately upon noticing the police, Officer O'Palski's training and experience concerning concealed firearms, the identification of a large bulge in Johnson's pants pocket, and Johnson's suspicious behavior. *See Commonwealth v. Carter*, 105 A.3d 765, 766, 774-75 (Pa. Super. 2014) (*en banc*) (holding that police officer had reasonable suspicion to conduct a *Terry* frisk, where the defendant was standing on street corner in a high-crime area at night, had a weighted and angled bulge in his coat pocket, was alerted to the officer's presence and intentionally turned his body away several times to conceal the bulge in his coat pocket, and the officer observed the defendant walking away from known drug corner when the officer repeatedly circled the area); *Commonwealth v. Brown*, 904 A.2d 925, 928 (Pa. Super. 2006) (stating that unprovoked flight in a high-crime area from persons identifiable as

police officers is sufficient to establish reasonable suspicion to support an investigative detention); *see also Commonwealth v. Foglia*, 979 A.2d 357, 361 (Pa. Super. 2009) (*en banc*) (concluding that reasonable suspicion for a *Terry* frisk existed where the defendant, while located in a high-crime area, repeatedly looked back at the police and walked away from them, and "touched his waist area and sat down on a stoop behind some females … [and t]he police officer was aware, based upon his experience with armed suspects, that weapons are often concealed in a person's waistband"). Accordingly, the police possessed reasonable suspicion that Johnson was armed and dangerous, were thus authorized to conduct a limited *Terry* frisk of his person, and lawfully seized the handgun and marijuana.

Finally, the case law upon which Johnson relies is unavailing. Johnson principally relies on this Court's decision in *Commonwealth v. Martinez*, 588 A.2d 513 (Pa. Super. 1991). *See* Brief for Appellant at 23-25. In *Martinez*, police officers, in plain clothes and in an unmarked car, approached an intersection where four or five individuals were standing on a corner. *Martinez*, 588 A.2d at 515. After looking in the direction of the unmarked vehicle, Martinez began quickly walking in one direction, and the other individuals scattered in different directions. *Id.* The police drove alongside Martinez and observed her "holding her hands in the front of her coat, leaning forward, as if to be holding something, leaning forward, walking quickly up the street." *Id.* (citation to record omitted). One of the

officers then asked Martinez to walk over to the police car, take her hands out of her jacket, and put her hands on the car. *Id.* Martinez complied, and when she put her hands on the car, a plastic bag containing drugs fell from her coat onto the ground. *Id.*

On appeal, this Court in *Martinez* held that the suppression court had erred in determining that the above facts established reasonable suspicion to conduct a lawful investigative detention. *Id.* at 516-17. The panel stated that the suppression court improperly "mixed together facts of events occurring both *before* and *as a result of* the stop" and "seemingly believed that Martinez brought the search and seizure upon herself by 'drawing attention to herself.'" *Id.* at 516 (emphasis in original). The *Martinez* Court concluded that the only "articulable facts attributable to Martinez," which validly could support a conclusion of criminal activity being afoot, were that she "walked quickly away from a street corner, at 12:20 A.M.[,]" and "[s]he was holding her hands in the front of her coat and walking quickly up the street." *Id.*; *see also id.* at 517 (stating that "[t]hese facts are not enough.").

In contrast to *Martinez*, here, Officer O'Palski articulated his specific observation that, *prior* to stopping and frisking Johnson, (1) he saw a very large bulge in Johnson's pants pocket, and the object in the pocket was longer than a cell phone and appeared to be heavy; and (2) Johnson's behavior, when he was asked to remove his hand from his pocket, of

crouching forward, "blading" his body sideways, and side-stepping away, was indicative, based upon Officer O'Palski's training and experience, of a person carrying an illegal firearm. *See* N.T., 4/29/14, at 11-12, 36. To the contrary, in *Martinez*, prior to the police stopping and detaining the defendant, they had little more than an unparticularized suspicion or hunch that she was engaged in criminal activity when they observed her holding her coat out in front of her and leaning forward. *See Martinez*, 588 A.2d at 517. Moreover, unlike the defendant in *Martinez*, Officer O'Palski testified that when Johnson first looked in the direction of the marked police car, Johnson "immediately started *running*" in the opposite direction. N.T., 4/29/14, at 9 (emphasis added); *see also Brown*, *supra*.

Accordingly, the suppression court did not err or abuse its discretion in denying Johnson's Motion to suppress, and Johnson's issue on appeal fails.

Judgment of sentence affirmed.

*Judgment Entered.*

*Joseph D. Seletyn, Esq.*
*Prothonotary*

*Date: 11/16/2017*